**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SAMIA F.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.    24-cv-2840** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE**                           **July 16, 2026**

Samia F. (Plaintiff) brought this action seeking review of the Commissioner of Social

Security Administration's (SSA) decision denying her claim for Social Security Disability

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 (the Act).  This matter is

before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's

Request for Review (ECF No. 8) is **DENIED**.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed the instant application for disability benefits on March 3, 2022,

alleging disability beginning February 19, 2022, due to suffering a transient ischemic attack

(TIA), also referred to in the record as a cerebellar stroke.  (R. 96, 213).  Her application was

denied at the initial level on June 21, 2022, and upon reconsideration on October 26, 2022.  (R.

79-95, 107-17).  She thereafter requested a hearing before an Administrative Law Judge (ALJ).

(R. 118-20).  On August 7, 2023, Plaintiff, represented by counsel, as well as two of her family

members and a vocational expert, testified at the administrative hearing.  (R. 37-78).  On August

22, 2023, the ALJ issued a decision unfavorable to Plaintiff. (R. 14-36). She appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on May 13, 2024, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On June 28, 2024, Plaintiff filed a complaint in this Court. (Compl., ECF No. 1). She consented to the jurisdiction of the Honorable Elizabeth T. Hey, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) on July 2, 2024. (Consent, ECF No. 5). On October 2, 2024, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 8). The Commissioner filed a Response on December 2, 2024, (Resp., ECF No. 11), and Plaintiff filed a Reply on December 12, 2024. (Reply, ECF No. 13).

This case was reassigned to me on April 21, 2026, and Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) the same day. (Order, ECF No. 16; Consent, ECF No. 18). This case is fully briefed and ripe for disposition.

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on July 12, 1977, and was 44 years old on the alleged disability onset date. (R. 30, 219; Pl.'s Br., ECF No. 8, at 1). She received a bachelor of arts degree from a university in Egypt. (R. 48-49). Her past relevant work includes work as food preparer with Awesome Foods from July 2008 to February 2022. (R. 205).

### A.    Medical Evidence

By all accounts, Plaintiff appeared to be relatively healthy until February 19, 2022, when

2

she suffered a stroke.  (R. 52, 55, 57, 59-60, 67; Pl.'s Br., ECF No. 8, at 1-2).  The stroke was brought on by fibromuscular dysplasia (FMD), which Plaintiff had unknowingly developed prior to the stroke.  (Pl.'s Br., ECF No. 8, at 1).  She maintains that the stroke caused debilitating aftereffects that now preclude her from working.  (Pl.'s Br., ECF No. 8, at 2).

### 1.      Physical Impairments

On February 19, 2022, Plaintiff was taken to the Einstein Healthcare Network emergency room (Einstein ER) in East Norriton, Pennsylvania after collapsing to the floor suddenly.  (*See, e.g.*, R. 432).

> Per her husband and [Plaintiff] she states in the morning (2/19/22) she was trying to get a cup of tea ready and subsequently began to feel a dizziness and a severe pressure on her chest.  She then slowly began to go to the ground.  Her husband states that [he] and his son went to pick her up.  She was unable to ambulate and then (sic) to carry to the couch.  She states [] that she somewhat began to improve with her symptoms.  Per the husband they did not appreciate any slurred speech or facial droop but stated she was complaining of a lot of pain in her left arm.  They took her to the car and her symptoms began to improve even in that short duration of time.  She denies any previous episodes.  She denies any history of migraines, heart disease, or any additional symptoms at this time.

(R. 432-33 (alterations added)).

She had left-sided weakness and facial droop, and her arm hurt.  (*Id.*).  A computed tomography (CT) scan of Plaintiff's chest, abdomen, and pelvis was largely normal and revealed "no evidence of dissection."  (R. 433).  A CT angiogram "demonstrated overall patency of the cervical and intracranial arterial vasculature without proximal large vessel occlusion."  (*Id.*).  There was also a "suggestion of multifocal beading along the distal cervical internal carotid arteries in a pattern commonly associated with fibromuscular dysplasia," as well as "tortuosity of the intracranial and internal carotid arteries."  (*Id.*).  Finally, a CT scan of the head demonstrated

"no acute intracranial hemorrhage, or transcortical infarction." (*Id.*).

Plaintiff was assessed with a TIA, given a dose of aspirin with the recommendation to continue with course of it, and ordered an MRI. (R. 434). A neurology consultation from that same day noted:

> [H]istory of anemia, seen in the [emergency room] for Code Stroke alert with left sided weakness with [last known well] 11:55[am] with initial [stroke scale score] of 5 that progressively and rapidly improved with dizziness and chest tightness. [Computed tomography angiography] shows possible FMD bilaterally. Work up so far shows no acute areas of ischemia or infarcts and positive CTA for fibromuscular dysplasia. Feels she is not able work on her left leg.

(R. 1063 (alterations added)).

Plaintiff presented to Cynthia Ferrari, PA-C, on March 14, 2022, for a follow-up visit after suffering the stroke. (R. 1063-64). At this time, Plaintiff was suffering from dull headaches, coldness in her left side, weakness in her left leg, balance issues, and dizziness. (*Id.*). She reported, however, that any weakness in her left arm had resolved, and she denied any falls or autonomic symptoms related to her headaches. (R. 1063). Upon examination, she had no edema or joint, muscle, chest, or abdominal pain; displayed full motor capabilities in her upper extremities and right leg with "four-plus" capabilities (on a one-to-five scale) in her left leg; and had "[n]o extinction to double sided stimulation." (R. 1063-64). Ferrari ordered a physical therapy evaluation and treatment course for Plaintiff. (R. 1064). On July 6, 2022, Plaintiff returned for another follow-up. (R. 1059-62). She was still struggling with daily headaches, sensitivity to light, and fatigue (allowing for only 10-15 minutes of activity at a time). (R. 1059). She noted that she did not wake with the headaches but that they seemed to be brought on by stress, activity, or light. (*Id.*).

On June 21, 2022, State agency consultant Linda Myers, M.D., provided a medical

4

evaluation of Plaintiff.  (R. 82-86).  She noted hearing loss, along with some weakness related to Plaintiff's stroke.  (R. 82-84).  She opined that Plaintiff was: able to lift 20 pounds occasionally and ten pounds frequently; unlimited in her ability to push and/or pull with all four extremities; and able to sit, stand, and/or walk for six hours in an eight-hour workday.  (R. 83).  She further opined that Plaintiff: could frequently climb ramps and stairs, balance, stop, kneel, crouch, and crawl; could never climb ladders, ropes, and scaffolds; was limited in her ability to hear but unlimited in her ability to speak; and must avoid even moderate exposure to environmental hazards such as machinery and heights but was otherwise unlimited as to other environmental factors.  (R. 83-84).  Upon reconsideration on October 26, 2022, State agency consultant Joanna Deleo, D.O., noted Plaintiff's medically determinable impairments and largely agreed with the functional capacity findings of Dr. Myers.  (R. 87-95).

On July 29, 2022, Plaintiff presented to the Einstein ER complaining of a headache and generalized weakness, especially in her left leg.  (R. 805, 1058).  She stated that she awoke that morning with worsening headache symptoms, and that after she went to the kitchen, she was unable to get up out of her chair due to pain, fatigue, and weakness.  (R. 805).  The attending physician for the neurology department "felt her symptoms were consistent with complicated migraine."  (*Id.*).  A CTA performed on Plaintiff suggested FMD.  (*Id.*).  The attending physician also recommended an EMG of the left leg as well as an angiogram to evaluate the extent of Plaintiff's pain issues and confirm whether she indeed had FMD.  (*Id.*).

On August 23, 2022, Plaintiff again presented to Ferrari.  (R. 1054).  Ferrari noted that after receiving a "work-up" from the neurology department, it appeared that Plaintiff "was experiencing a . . . possible hemiplegic migraine."  (*Id.*).  She further noted that Plaintiff appeared to be "very distraught" regarding her symptoms, and Plaintiff reported that her

headaches persisted, describing them as "located over top of the head" with pressure, associated balance issues, and fatigue. (*Id.*). According to Plaintiff, she would wake up every morning with mild headaches, but they would "ramp up to a 9 out of 10 within the hour." (*Id.*). Sleep tended to improve her symptoms and walking tended to worsen them. (*Id.*). Upon neurological examination, Plaintiff was alert and oriented with no abnormalities noted and demonstrated full motor capacity in her upper extremities and four-out-of-five capabilities in her lower extremities. (R. 1055).

On September 8, 2022, Plaintiff, accompanied by her husband, presented to Ferrari reporting that she had recently had a religious experience that made her feel her headaches and energy had improved while lying down. (R. 1052). Nevertheless, she still had daily headaches that measured five to eight on the visual analogue scale (VAS). (*Id.*). Her husband stated that they went for walks during nicer weather and that her mood and anxiety had improved. (*Id.*). Nonetheless, she was anxious about an upcoming angiogram as well as the possible side-effects of taking topiramate. (R. 1053). She ultimately agreed to begin a regimen of 25 milligrams of topiramate at bedtime for the next one to two weeks. (*Id.*).

On October 28, 2022, Ferrari noted that Plaintiff: had undergone an EMG nerve study that revealed chronic L5-S1 radiculopathy on the left; was unable to attend physical therapy sessions due to physical weakness and fatigue; reported her headaches had improved greatly; had "sensory symptoms of decreased sensation to temperature over the left hemibody," although they "seem[e]d resolved"; and was currently taking topiramate. (R. 1045-46, 1049). Ferrari suspected FMD based on Plaintiff's February 2022 stroke. (R. 1046, 1049). Plaintiff refused to have a cerebral cervical angiogram performed due to concerns about invasive testing, but Ferrari noted that an MRI showed the stroke occurred in the left cerebellum. (*Id.*).

6

On January 11, 2023, Plaintiff again presented to Ferrari, who noted that Plaintiff: continued to experience generalized weakness and fatigue but no longer felt left-sided weakness; suffered frequent headaches (though not daily) lasting between 20 minutes and a few hours and often triggered by loud noises, though she denied any associated nausea, vomiting, photophobia, autonomic features, or pulsatile tinnitus; no longer suffered from migraines; suffered episodic social anxiety; and had stopped taking topiramate. (R. 1045). Upon examination, Ferrari noted Plaintiff demonstrated: appropriate affect; normal orientation and speech; "5 out of 5" motor skills in all four extremities along with normal strength testing; no involuntary movements or ataxia; and intact sensation to light, touch and temperature. (R. 1046).

On June 6, 2023, Plaintiff presented to Ferrari for a follow-up appointment. (R. 1212). Plaintiff reported "doing better" in general and stated she had no issues with left-sided weakness. (*Id.*). She was still experiencing headaches, but she admitted that she did not fully comply with the topiramate regimen prescribed by her doctor. (*Id.* (Plaintiff "was previously trialed on topiramate[, however she] became anxious regarding titration schedule and never took it past 25 mg twice daily") (alteration added)). Ferrari noted that Plaintiff was unable to take nonsteroidal anti-inflammatory drugs for her headache symptoms because she was taking Plavix at the time. (*Id.*). In addition, Plaintiff reported that Tylenol was ineffective in treating her symptoms. (*Id.*). She was unable to take triptans due to her stroke history. (*Id.*).

On July 6, 2023, Plaintiff presented to Ferrari for another follow-up appointment, complaining that her headaches had "ramped up" and were occurring daily again. (R. 1216). She stated that by 11 a.m. she had "pounding migraine[s] measuring about 8 out of 10" with associated photophobia, phonophobia, dizziness, mental fog, and physical fatigue. (*Id.*). According to Plaintiff, lying down in a dark room "slightly" relieved her symptoms, and standing

7

or engaging in any type of light household work exacerbated them.  (*Id.*).  Ferrari prescribed Plaintiff a daily regimen of Qulipta, a preventative medication for migraines.  (R. 1218).

On July 6, 2023, Ferrari completed a medical source statement, evaluating Plaintiff's impairments.  (R. 1169-76).  She noted Plaintiff experienced headaches three to four times per week, typically lasting between 12 and 24 hours.  (R. 1169).  Ferrari noted that Plaintiff's headaches frequently interfered with her ability to concentrate, that she would likely be off-task 25 percent (or more) of a typical workday, and that she was likely to miss three or more days of work per month due to her impairments.  (R. 1170-71).  She also stated that Plaintiff: could not handle any work-related stress and that she was "unable to work" based on her limitations.  (*Id.*).  In noting the medical findings that supported her opinion, Ferrari stated: "frontal squeezing headaches 8 to 10/10 on VAS scale with associated photophobia, dizziness, and phonophobia, mental fog, and physical fatigue."  (R. 1170).  Ultimately, Ferrari opined that given her severe impairments, Plaintiff could: never lift ten pounds or more, climb, bend, stoop, balance, or crawl; rarely lift zero to ten pounds or kneel; occasionally crouch, squat, or twist; sit for up to four hours and stand or walk for up to two hours in a typical workday; and handle, finger, and reach with both upper extremities for only 10 percent of a typical workday.  (R. 1172-73).

Plaintiff also treated with Peter Edde, M.D., of Einstein Healthcare beginning February 26, 2022.  (R. 336-73).  On that date, Dr. Edde noted that Plaintiff already reported feeling progressively better one week after her stroke.  (R. 343).  She was still experiencing balancing issues but stated that she felt her strength coming back.  (*Id.*).  Her physical examination results were largely normal with full motor strength in both upper extremities.  (*Id.*).  Dr. Edde discussed with Plaintiff the likelihood that her stroke had been caused by FMD but emphasized the importance of further diagnostic steps in order to confirm that hypothesis.  (R. 344).  He

8

referred her to the neurology department and ordered an occupational therapy evaluation and outpatient treatment. (R. 344-45). At a follow-up on March 10, 2022, Plaintiff noted that her physical therapy sessions had been beneficial. (R. 347). On April 26, 2022, she again reported dizziness and fatigue. (R. 349). At that time, she still had not presented to the neurology department for the recommended consultation. (*Id.*).

On July 7, 2023, Dr. Edde completed a medical source statement evaluating Plaintiff's impairments. (R. 1177-87). He noted Plaintiff experienced headaches three to four times per week, and that they typically lasted 10 or more hours. (R. 1178). He opined that: these headaches would frequently interfere with Plaintiff's ability to concentrate; she would therefore be off task 25 percent or more of the time; she would miss three or more days of work per month; and she was incapable of performing even low stress jobs. (R. 1179-80). Dr. Edde assessed that due to Plaintiff's impairments, she could: never lift 50 pounds or climb; rarely lift 20 pounds, bend, stoop, twist, and crawl; occasionally lift 10 pounds, kneel, crouch, squat, and balance; sit for about four hours and stand or walk for less than two hours in a typical workday; and handle, finger, and reach only 10 percent with both upper extremities. (R. 1181-82). Dr. Edde stated that the medical findings supporting his assessment included the fact that her stroke had caused debilitating headaches and fatigue, and that her husband and son reported significant issues with her balance and motor functions, especially in her left upper extremity. (R. 1179, 1182). Dr. Edde noted that her physical impairments since suffering the stroke had also affected her mental health and capabilities. (R. 1184-86). He opined that she had: mild limitations in her ability to interact with co-workers and supervisors; moderate limitations in her ability to make judgments on simple work-related decisions; marked limitations in her ability to interact appropriately with the public, respond appropriately to usual work situations, and understand,

remember, and carry out and apply instructions; and extreme limitations in her ability to respond appropriately to changes in a work setting and maintain concentration, persistence, and pace. (R. 1184-85). He added that Plaintiff also became anxious when going out in public alone. (R. 1185).

Additionally, Plaintiff treated with Melissa Weigand, C.R.N.P., of Bridgeport Family Practice Clinic in Bridgeport, Pennsylvania. (R. 930-39). On September 13, 2022, Weigand noted that although Plaintiff continued to have some left-sided weakness and fatigue, her headaches had resolved since starting topiramate roughly one week prior. (R. 930). Upon examination, Plaintiff was negative for chest tightness or pain, shortness of breath, palpitations, dizziness, headaches, or leg swelling, but she was positive for weakness. (R. 931). In addition, she was alert and displayed normal appearance, thought content, behavior, and other pulmonary and cardiovascular indicators. (R. 933).

### 2.    Mental Impairments

Plaintiff also began experiencing mental health issues after the stroke. She treated with Nicole Wilson-Carr, N.P., with LifeStance Health in King of Prussia, Pennsylvania from May 3 through 31, 2023. (R. 1110-20). Plaintiff's chief complaint was that she suffered from social phobia and anxiety since the stroke. (R. 1111). According to her, these symptoms arose after she was taken to the emergency room and given the wrong medication that caused her to have a serious reaction. (*Id.*). On May 3, 2023, Wilson-Carr noted that Plaintiff's past medical history included migraines, supraventricular tachycardia, weakness, and the aforementioned cerebrovascular accident (CVA, i.e., a stroke). (*Id.*). At the time, she was taking Plavix and Crestor with no reported side effects. (R. 1112). Upon examination, Wilson-Carr noted: that Plaintiff was alert and oriented to person, place, time, and situation; euthymic mood; full and

appropriate affect with appropriate dress, grooming, and hygiene; no acute distress; normal gait and upright station with no notable abnormal movements or coordination issues; normal speech; intact association and fund of knowledge; logical thought process and good memory; no abnormal thought content; and unimpaired judgment. (R. 1113). She recorded diagnoses of generalized anxiety disorder, social phobia, and post-traumatic stress disorder (PTSD), prescribed Buspar, and encouraged Plaintiff to continue her sessions with her counselor. (R. 1114). At a follow-up appointment on May 31, 2023, Plaintiff noted that she did not experience much difference while taking Buspar, and again reiterated that her anxiety issues stemmed from the hospital visit wherein she was given the wrong medication. (R. 1116). However, Wilson-Carr noted that Plaintiff had seen a 30 percent decrease in symptoms associated with her anxiety and depression, albeit with "limited" psychotherapy progress. (*Id.*). Plaintiff confirmed that she continued to see her church counselor every two weeks, and Wilson-Carr discussed creating goals such as walking around the neighborhood with Plaintiff, as well as the benefits of positive reframing and self-talk. (*Id.*). Upon examination, Plaintiff demonstrated: anxious mood; full and appropriate affect; appropriate dress, grooming, and hygiene; normal gait and upright station with no notable abnormal movements or coordination issues; orientation to person, place, time, and situation; normal speech; intact associations and logical thought processes with no abnormal thought content; good memory; an intact fund of knowledge; and unimpaired judgment and insight. (R. 1117). Wilson-Carr discontinued Plaintiff's Buspar, started her on a regimen of Prozac, and again encouraged her to continue counseling. (R. 1118).

Plaintiff received counseling services from Rev. Dr. Mina Shaheid, a professional counselor with St. George Coptic Orthodox Church in Philadelphia, beginning March 15, 2023. (R. 1193-95). On that date, Rev. Dr. Shaheid noted Plaintiff's complaints of major depressive

11

episodes, persistent sadness, irritable mood, low energy, fatigue, and an inability to carry out normal daily activities. (R. 1193). She ultimately concluded that Plaintiff "experiences impairment of daily functions due to debilitating fear and anxiety," that she "seeks to avoid situations that require a degree of interpersonal contact," and that she is "reluctant in becoming involved in social situations." (*Id.*).

Rev. Dr. Shaheid offered two opinions pertaining to Plaintiff's mental function capacity on July 7 and July 24, 2023. (R. 1188-95). On July 7, 2023, Rev. Dr. Shaheid opined that Plaintiff has marked to extreme limitations in all areas of mental work-related abilities, would be off task 20 percent of the day, and would be absent three or more days per month due to her impairments. (R. 1188-92). In addition to her earlier findings, she added that Plaintiff had debilitating performance anxiety; worried excessively; and displayed fatigue, concentration difficulties, and possible impairment of daily functioning. (R. 1189). Finally, she stated that all symptoms and limitations dated back to March 15, 2023. (R. 1190). On July 24, 2023, Rev. Dr. Shaheid opined that "it is evident that [Plaintiff] experiences impairment of daily functions due to debilitating fear and anxiety." (R. 1193). She further noted that Plaintiff "seeks to avoid situations that require a degree of interpersonal contact" and is "reluctant in becoming involved in social situations." (*Id.*).

Dr. Edde noted that her physical impairments since suffering the stroke had affected her mental health and capabilities. (R. 1184-86). On July 7, 2023, he opined that she had: mild limitations in her ability to interact with co-workers and supervisors; moderate limitations in her ability to make judgments on simple work-related decisions; marked limitations in her ability to interact appropriately with the public, respond appropriately to usual work situations, and understand, remember, and carry out and apply instructions; and extreme limitations in her

ability to respond appropriately to changes in a work setting and maintain concentration, persistence, and pace.  (R. 1184-85).  Dr. Edde noted that Plaintiff becomes anxious when going out in public alone.  (R. 1185).

On June 21, 2022, State agency psychological consultant Arlene Rattan performed a mental examination of Plaintiff.  (R. 80-86).  She noted that Plaintiff did not allege any mental health impairments but did report stress and concentration issues.  (R. 81).  She added that Plaintiff's mental status examination results also did not indicate any mental health issues.  (*Id.*).  Thus, Rattan found that Plaintiff had no medically determinable mental health issues.  (R. 82).  She did note that Plaintiff had experienced hearing loss, though.  (R. 81-82).  Upon reconsideration on October 26, 2022, State agency psychological consultant Edward Jonas noted Plaintiff's medically determinable impairments but largely agreed with the functional capacity findings of Rattan.  (R. 87-95).

### B.    Nonmedical Evidence

The record also contains nonmedical evidence.  Plaintiff testified at the August 7, 2023, administrative hearing as to her work history, the severity of her medical issues since the stroke, and how those medical issues affected her functional capacity.  (R. 48-57).  Plaintiff testified that she lived with her husband and their two children aged 17 and 19.  (R. 48).  She last worked in February 2022 as a food preparer, two days prior to her stroke, and has not worked since.  (R. 49-50).  Prior to the stroke, her work duties included preparing food, lifting and carrying between 25 and 50 pounds, and using tools and machinery.  (R. 50-53).

According to Plaintiff, before suffering her stroke, she used to drive frequently, shop, cook, clean for her family, and go to work nearly every day, but now she does not.  (R. 48, 56-57).  Immediately after, she was unable to move her left arm and leg; however, she reported her

left extremities have "gotten better," though she still cannot hold anything in her left hand. (R. 51). She further explained that her left hand became painful and started to tingle if she used it more than 10 minutes, and that her left leg became painful, weak, and numb after standing more than 15 minutes. (R. 54). She indicated that she is "always tired" throughout the day and is sensitive to loud noises, to the point that she could not raise her voice due to headaches. (R. 51). Since suffering the stroke, she experienced severe headaches nearly every day, sometimes lasting up to 12 hours and requiring her to go to a dark, quiet room in order to remediate her symptoms. (R. 52, 56). She began taking topiramate for these headaches, which "helped a little" but also caused her nausea and drowsiness. (R. 52-53, 55-56). Plaintiff also noted she now has trouble concentrating. (R. 57).

Additionally, Plaintiff's husband testified at the hearing regarding how Plaintiff's stroke had affected her. (R. 59-64). He reiterated much of what Plaintiff said about her ability to cook, clean, shop, drive, and concentrate before and after the stroke. (R. 59-62-63). He also indicated that since suffering the stroke Plaintiff seemed to have balance problems and thus required assistance bathing and showering. (R. 59-60).

Lastly, Plaintiff's son testified regarding her functional capacity before and after her stroke, reiterating much of the foregoing testimony. (R. 64-68). He noted that her more severe headaches typically occurred three to four times per week and usually required her to spend eight to 12 hours alone in her room. (R. 66). He claimed that she was not functional "even half of the week." (R. 67-68).

Plaintiff completed two adult function reports on May 10 and September 29, 2022. (R. 221-31, 258-72). In her first report, she noted that since she suffered her stroke, she could no longer perform any physical activities for more than 10 minutes without feeling dizzy and losing

14

her balance.  (R. 221, 226).  She was always tired and slept far more than previously.  (R. 222).  On days when she felt well, she would "do some home stuff for a little bit," though she still became fatigued after only a short while and still required assistance from her husband to bathe herself.  (*Id.*).  She added that she experienced weakness in both left extremities, which affected use of them.  (R. 223).  Notwithstanding these limitations, Plaintiff stated that she tried to walk 10 minutes every day as a form of physical therapy.  (R. 224).  According to Plaintiff, she needed to be accompanied whenever she went outside due to her frequent dizziness and balance issues.  (*Id.*).  She also attended physical therapy sessions twice per week, church once per week, and received friends and family for visits once or twice per week.  (R. 225).  Finally, she reported that the recent onset of symptoms related to her stroke limited her ability to lift, squat, bend, stand, reach, use her hands, walk, kneel, climb stairs, remember, complete tasks, concentrate and interact with others.  (R. 225-26).  Notwithstanding her difficulties maintaining concentration, she indicated she was able to follow short, simple instructions well, but that more complex instructions would take her much longer to complete.  (R. 226).  In her second report, she reiterated the foregoing information but added that her impairments also limited her ability to sit, talk, see and understand.  (R. 258-72).

Plaintiff's husband also completed a third-party adult function report on September 29, 2022, endorsing similar functionality as described by Plaintiff in her reports.  (R. 243-57).  He maintained that since suffering her stroke, Plaintiff: mostly remained home resting or watching television; only went out when accompanied by friends or family; slept a lot more than before; was fatigued more often; required help bathing; rarely cooked or cleaned; had trouble maintaining her balance and focusing; and could sometimes follow instructions well.  (R. 243-48).

**III.    ALJ DECISION**

Following the administrative hearing, the ALJ issued a decision in which she made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2027 (4D).

2.      The claimant has not engaged in substantial gainful activity since February 19, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: history of transient ischemic attack (TIA) and cerebrovascular accident (CVA); fibromuscular dysplasia; and migraine headaches (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl as defined in the SCO; and can tolerate a moderate noise level.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July 12, 1977 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

16

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 19, 2022, through the date of this decision (20 CFR 404.1520(g)).

(R. 19-31).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 31).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If [s]he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits [her] physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform [her] past work.  If the claimant cannot perform [her] past work, then the final step is to

> determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. § 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In her request for review, Plaintiff raises two broad issues (reordered): (1) the ALJ failed to properly evaluate the medical opinion evidence; and (2) the ALJ overstated Plaintiff's functional capacity in her RFC finding. (Pl.'s Br., ECF No. 8, at 3).

### A.    The ALJ's Treatment of the Medical Evidence

#### 1.    The Parties' Arguments

Plaintiff argues that the ALJ erred in her evaluation of the opinions of three treating providers: Ferrari, Dr. Edde, and Rev. Dr. Shaheid. (Pl.'s Br., ECF No. 8, at 18-29). She also advances an unrelated argument that the ALJ failed to appropriately consider her, her husband's, and her son's statements regarding the severity of her impairments. (*Id.* at 29-30). Had the ALJ properly credited these opinions and statements, Plaintiff argues she would have had no choice but to find Plaintiff disabled. (*Id.*).

Initially, Plaintiff contends that the opinions of Ferrari and Dr. Edde were consistent with each other and should have been credited by the ALJ. (*Id.* at 23-24). She observes that in rejecting these two opinions, the ALJ asserted that neither was supported by treatment notes but maintains that this assertion is patently false in both instances. (*Id.* at 24-25). Plaintiff maintains that Ferrari's longitudinal treatment notes support her opinion because they illustrate Plaintiff's migraines and related symptoms began after she suffered the stroke in February 2022, remained relatively constant save for a brief period in late 2022 during which she was taking topiramate, and had returned by July 2023 after Plaintiff discontinued topiramate based on the side effects she was experiencing. (*Id.* at 22-23). According to Plaintiff, these clinical notes support Ferrari's opinion that her headaches and related side effects preclude her from working. (*Id.* at 23-24).

With regard to Dr. Edde's opinion as to Plaintiff's physical limitations, Plaintiff argues that the ALJ's rationale for discounting it—that her main symptoms of weakness and fatigue had subsided—was factually inaccurate and ignored her other relevant symptoms such as lack of activity tolerance, dizziness, and balance issues. (*Id.* at 25). Similarly, Plaintiff observes that the ALJ discounted Dr. Edde's opinion regarding her mental functional capacity because it was allegedly not supported by Dr. Edde's own treatment notes and he is not a mental health

19

specialist. (*Id.* at 28-29). But she insists that these grounds were factually inaccurate and illustrate that the ALJ arrogated to herself the role of medical professional. (*Id.* at 28-29). According to Plaintiff, the ALJ's analysis consisted primarily of "general conclusions and over-simplification[s]" of her symptoms stemming from a combination of impairments. (*Id.* at 28).

Turning to Rev. Dr. Shaheid's mental function opinions, Plaintiff notes that the ALJ relied upon a lack of treatment records supporting her conclusions and essentially normal mental status examinations. (*Id.* at 27 (citing R. 29)). Per Plaintiff, these explanations are factually inaccurate, ignore other record evidence consistent with the opinions, and are generally insufficient under the regulations. (*Id.*).

Finally, Plaintiff presents her and her family's statements regarding the severity of her symptoms, notes that the regulations require the ALJ to consider her statements regarding the severity of her symptoms, and emphasizes that the regulations acknowledge that symptoms alone can result in work-preclusive limitations and that the full limiting effects of an individual's symptoms may be greater than objective medical evidence alone establishes. (*Id.* at 29-30 (citing 20 C.F.R. § 404.1529(c)(2)-(3))). She complains that the ALJ discounted these statements as to the severity of her symptoms based on faulty logic—that her symptoms of fatigue, dizziness, and balance issues were non-existent and that no evidence existed that her migraines would continue beyond July 2023—and therefore posits that the ALJ failed in her duty to build a logical bridge between the evidence and her findings. (*Id.*). Ultimately, Plaintiff emphasizes that the opinions of Ferrari, Dr. Edde, and Rev. Dr. Shaheid "almost mirror" her and her family's consistent, well-supported testimony. (*Id.* at 29).

In response, the Commissioner defends the ALJ's treatment of the foregoing medical opinion evidence on three grounds: (1) she reasonably found the prior State agency opinions of

Drs. Myers and Deleo that Plaintiff could perform a range of light work persuasive; (2) the opinions were checkbox forms appropriately given less weight; and (3) the ALJ's explanation that those opinions were neither supported by longitudinal treatment notes nor consistent with other record evidence sufficed to discount them. (Resp., ECF No. 11, at 13-14 (citing R. 27-29, 80-86, 87-93, 1169-74, 1177-86, 1188-90)). Additionally, he argues that "the decision reflects[] the ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms inconsistent with the medical evidence and other evidence of record." (*Id.* at 9 (citing R. 24-25)). He highlights that despite the subjective evidence, Ferrari, Dr. Edde, and Rev. Dr. Shaheid's periodic examinations returned normal results and Plaintiff's course of treatment (including a lack of hospitalizations) was inconsistent with the "extreme limitations" set forth in the opinions. (*Id.* at 14). The Commissioner further points out that the ALJ concluded that these medical providers failed to identify supporting record evidence. (*Id.* (citing R. 27-29)). Ultimately, the Commissioner argues that Plaintiff's contentions amount to a mere disagreement with the ALJ about the weight to be afforded the various evidence in the record, but that is not sufficient to warrant reversal or a finding of disability in this Court. (*Id.* at 14-15 (citing *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009))).

Plaintiff replies that the Commissioner's arguments pertaining to the ALJ's analysis of the medical evidence are impermissible post hoc rationalizations. (Reply, ECF No. 13, at 5 (citing *Thorpe*, 2023 WL 5152306, at *10-12)). She also maintains that the ALJ failed to engage with the "*reasons*" offered by Ferrari, Dr. Edde, and Rev. Dr. Shaheid justifying their opinions. (*Id.* at 5-6 (emphasis in original)). Therefore, Plaintiff submits that the ALJ's supportability analysis was inherently flawed. (*Id.* (citing *Galgoci v. Comm'r of Soc. Sec.*, No. 1:23-cv-01530, 2024 WL 3871751, at *9 (M.D. Pa. Aug. 19, 2024))).

21

####    2.    Analysis

Though one of the Commissioner's stated arguments is an attempted post hoc rationalization,[1] I ultimately agree with him that substantial evidence supported the ALJ's findings regarding the three opinions at issue.

In making an RFC determination, an ALJ must consider the medical opinions together with the rest of the relevant evidence, and explain the weight given to those opinions in her decision. *Chandler*, 667 F.3d at 362. While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Id.* at 361. When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981)). Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See, e.g.*, *Byrd v. Comm'r of Soc. Sec.*, No. 23-4957, 2024 WL 4631645, at *9 (E.D.

---

[1] The Commissioner attempts to rely upon the fact that the three opinions were checkbox forms as further support for the ALJ's treatment of them. (*See* Resp., ECF No. 11, at 14). However, the ALJ herself did not mention this ground as a basis for rejecting them. (*See generally* R. 26-30). Accordingly, the Court does not consider this additional argument. *See Fongsue v. Saul*, No. 20-574, 2020 WL 5849430, at *8 (E.D. Pa. 2020) ("[T]his court is constrained to review only the ALJ's reasoning, not the post hoc arguments propounded by Defendant after the ALJ's decision.") (citing *Fargnoli*, 247 F.3d at 44 n.7 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."))); *Teada v. Comm'r of Soc. Sec.*, No. 19-4537, 2020 WL 1953660, at *2-3 (E.D. Pa. 2020) (citations omitted).

Pa. Oct. 30, 2024); *Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).  The social security regulations "require, an ALJ to offer 'a narrative discussion describing how the evidence supports'" the limitations imposed.  *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8p, at *7).  An "ALJ 'may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'"  *Mason*, 994 F.2d at 1067 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)); *see also Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1986).

When evaluating medical evidence, the most important factors are supportability and consistency, and the ALJ must explain how he or she considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in the determination or decision.  20 C.F.R. § 404.1520c(a)-(c).  The remaining factors include the medical source's relationship with the claimant, the medical source's specialization, and other factors that tend to support or contradict the medical opinion.  *Id.* at § 404.1520c(c).  An ALJ, in her discretion, need only reference these other factors if she finds that two medical opinions about the same issue are equally persuasive, well-supported, and consistent with the record evidence.  *Id.* at § 404.1520c(b)(3).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review."  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*, 220 F.3d at 119).  The ALJ must provide "not only an expression of the evidence [she] considered which supports the result, but also some indication of the evidence which was rejected."  *Cotter*, 642 F.2d at 705 (alteration added); *see also*

23

*Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [she] must give some indication of the evidence which [she] rejects and [her] reason(s) for discounting such evidence.") (alterations added).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id.*

Based on the above principles, the ALJ did not err in her evaluation of the medical evidence, including the opinions of Ferrari, Dr. Edde, and Rev. Dr. Shaheid.  In finding unpersuasive Ferrari's opinion that Plaintiff's headaches would preclude her from work, the ALJ noted that Ferrari's own treatment notes documented "resolution of [Plaintiff's] migraines, discontinuation of migraine medication, and infrequent headaches."  (*See* R. 27 (citing R. 1045-67)).  Indeed, on multiple occasions Plaintiff reported to Ferrari that her headache and migraine symptoms had subsided.  (*See, e.g.* R. 1045, 1049-52).  In addition, other providers (including Nurse Weigand) noted in September 2023 that Plaintiff's headaches had resolved with topiramate.  (*See, e.g.*, R. 930).  Further, the ALJ credited the opinions of State agency consultants Drs. Myers and Deleo finding that Plaintiff could perform a range of light work.  (*See* R. 27 (citing R. 80-95)).  Therefore, the ALJ engaged in the supportability and consistency analysis required under 20 C.F.R. § 404.1520c(a)-(c).  Though Plaintiff argues that her headaches returned in June and July 2023, the ALJ was within her discretion in noting that Plaintiff had not shown that her "migraines and headaches will persist at this frequency or intensity."  (R. 23); *cf. Markoch v. Comm'r of Soc. Sec.*, No. 1:20-CV-00417, 2020 WL 7586953, at *4-5 (D.N.J. Dec. 22, 2020) ("It is Plaintiff's burden to establish the severity of her impairments, and Plaintiff's challenge to the ALJ's consideration of her non-severe impairments amounts to mere disagreement with his analysis rather than showing any substantive error."); *Poulos*, 474 F.3d at 92 (it is the disability claimant's burden to establish disability).

In finding unpersuasive Dr. Edde's opinion that Plaintiff's headaches would preclude her from work, the ALJ again highlighted treatment notes from Ferrari[2] indicating they had subsided and from Nurse Weigand indicating topiramate was effective in treating them. (*See* R. 28 (citing R. 930, 1045-67)). The ALJ found that "the record supports, at most, a limitation to moderate noise level because of stress and tension headaches" and ultimately included a corresponding limitation in Plaintiff's RFC. (*See* R. 23, 28).

Regarding Dr. Edde's opinion that Plaintiff's other symptoms related to her physical capabilities would preclude her from work, the ALJ found that this was inconsistent with his own treatment notes as well as additional record evidence consistently indicating those symptoms had resolved. (*See* R. 28 (citing R. 336-73, 1068-1109)). Indeed, Dr. Edde noted on multiple occasions that Plaintiff indicated her strength had returned, that she felt she was improving, and that her physical therapy sessions had been beneficial. (*See* R. 343-47). In addition, on February 26, 2022, Dr. Edde recorded largely normal physical examination results with full motor strength in both upper extremities. (R. 343). The ALJ also emphasized other record evidence—including treatment notes from Weigand, Ferrari, and other providers—indicating the same, as well as the fact that Plaintiff maintained a stable gait. (R. 28 (citing R. 510, 667, 723, 1055-56, 1136)). This review illustrates the ALJ engaged in the appropriate analysis required by the regulations in finding this portion of Dr. Edde's opinion unpersuasive. *Cf.* 20 C.F.R. § 404.1520c(a)-(c).

In finding unpersuasive the portions of Dr. Edde and Rev. Dr. Shaheid's opinions related to Plaintiff's mental capabilities, the ALJ highlighted substantial record evidence indicating Plaintiff's mental status examinations were largely normal, including the psychological

---

[2] Though the ALJ stated that Dr. Edde's notes indicated the same, she actually cited Ferrari's treatment notes. (R. 28).

diagnostic evaluation conducted on May 3, 2023, by Wilson-Carr, who noted largely normal mental status examination results and expressly found that Plaintiff's symptoms related to her anxiety and depression had decreased by 30 percent.  (*See* R. 28-29 (citing R. 1045-67, 1110-20, 1188-92, 1193-95)).  Again, this identification of substantial evidence supporting the decision suffices to satisfy the regulatory requirements contained in 20 C.F.R. § 404.1520c(a)-(c).

Finally, in an effort to bolster her arguments, Plaintiff alludes to her and her family's supporting testimony, (Pl.'s Br., ECF No. 8, at 28-30), but an ALJ is not required to credit evidence or testimony from a disability claimant (or, for that matter, her family members)—all that is required is that she consider it along with the other record evidence.  *See Chandler*, 667 F.3d at 363 ("Although 'any statements of the individual concerning his or her symptoms must be carefully considered,' the ALJ is not required to credit them.") (citing SSR 96-7p (July 2, 1996; 20 C.F.R. § 404.1529(a))).  Here, the ALJ did this when she reviewed Plaintiff and her family members' statements regarding the extent of her disability, but ultimately found they were not consistent with other record evidence.  (*See* R. 23-26).

Ultimately, it is clear which evidence and factors the ALJ relied upon in evaluating the medical evidence, *cf. Gross v. Comm'r of Soc. Sec.*, 653 Fed. App'x 116, 120 (3d Cir. 2016) (the Act requires only that the agency's path "may reasonably be discerned") (quoting *Christ the King Manor, Inc. v. Sec'y of Health & Hum. Servs.*, 730 F.3d 291, 305 (3d Cir. 2013)), and the ALJ was within her discretion in finding that the opinions noted above were not fully supported by the providers' own treatment notes and not consistent with the rest of the record evidence. *See Burnett*, 220 F.3d at 118.

In sum, for the reasons laid out above, the ALJ did not err in her evaluation of the medical evidence.

### B.      Plaintiff's RFC

#### 1.       The Parties' Arguments

Plaintiff argues that the ALJ ignored certain evidence, resulting in an overstated RFC determination.  (*Id.* at 4-17).  First, she maintains that she suffered from FMD which caused her migraines, uncontrolled diabetes, PTSD, agoraphobia, and social phobia.  (*Id.* at 4).  She maintains that these symptoms collectively result in an inability to tolerate activity, and require rest periods throughout the day.  (*Id.* at 5).  Regarding her physical functionality, she contends "the record shows that Plaintiff could walk/stand for about 15 minutes before having to sit down/rest."  (*Id.* (citing R. 961, 965, 968, 971, 974, 976, 979, 982, 984, 986, 988, 991, 994, 996, 998, 999, 1001, 1004, 1007, 1008, 1009, 1013, 1015, 1020,1023, 1026, 1030, 1033, 1036, 1039)).  Plaintiff argues that her well-documented "lack of stamina" demonstrates her inability to work a full eight-hour workday.  (*Id.* at 5-6).  According to Plaintiff, the ALJ's bald statement that her FMD was well-controlled by her statin medication was simply "not true."  (*Id.* at 6 (citing R. 26)).  She also argues that the ALJ understated the debilitating effects of her headaches.  (*Id.* at 6-8).  Though Plaintiff acknowledges that topiramate helped remediate her headaches, she maintains that the record illustrates she could not tolerate the severe fatigue and dizziness caused by it.  (*Id.* at 6-7).  After she ceased topiramate, she notes that her headaches "returned with a vengeance" by mid-2023.  (*Id.* at 7 (citing R. 26)).  She insists that her migraines and headaches "are resistant to treatment," and that the ALJ's finding that the evidence does not show that they will persist is simply wrong.  (*Id.* at 7-8).  In addition, Plaintiff contends that her Plavix "contribute[d] to [her] menometrorrhagia with symptoms of fatigue and headaches," which worsened demonstrably during her menstrual cycle.  (*Id.* at 8-9 (citing R. 349)).  She argues that these related gynecological issues should have been categorized as a

separate medically determinable impairment worthy of individual consideration.  (*Id.* at 4-5, 8-10).  Moreover, she posits that the ALJ failed to consider whether she had any justifiable reasons to forego certain treatment options related to her FMD.  (*Id.* at 10).

Plaintiff's second sub-argument is that the ALJ failed to explain the relative impact of her other physical impairments, including: diabetes mellitus, Mediterranean anemia (thalassemia), anemia and loss of reflexes in all of her extremities affecting her ability to handle objects, stand, or walk.  (*Id.* at 10-11).  Though the ALJ was not required to make any specific findings as to these conditions, Plaintiff contends that she was at least required to consider them in making her RFC determination.  (*Id.* at 11-12).

Third, Plaintiff continues that the ALJ erred in her consideration of Plaintiff's mental impairments, including her diagnosed anxiety, PTSD, depression, social phobia, and agoraphobia.  (*Id.* at 12-17).  Given her alleged fear of going outside and "public social situations," Plaintiff argues the record shows that she "cannot[] leave her domicile without a family or close church member,[] is obviously anxious in the stress[-]free non-confrontational environment (with her husband present) with her treating (sic), and [cannot] be alone even in the safety of her own home without becoming 'unnerved.'"  (*Id.* at 13 (citing R. 1118)).  She adds that her symptoms increase and ability to cope with them deteriorates if she becomes stressed or must interact with others without her husband next to her.  (*Id.* at 14).  According to Plaintiff, "this would not be tolerated by employers," and the ALJ's sole reliance on "normal" mental status examinations was legally insufficient to discount the other record evidence indicating greater function limitations.  (*Id.* at 13-14).  Instead, Plaintiff maintains that the regulations require the ALJ to determine "exactly how a claimant will respond [to stress] in the work environment" given that all jobs necessarily involve interaction with others and other stressors.

(*Id.* at 14-15 (citing SSR 85-16, 1985 WL 56855; SSR 85-15, 1985 WL 56857)).  Lastly, Plaintiff posits that the ALJ erred by not acknowledging her PTSD diagnosis in the decision.  (*Id.* at 17).

For these reasons, Plaintiff concludes the ALJ did not establish "a 'logical bridge'" from the evidence to her determinations, thus rendering "meaningful judicial review impossible."  (*Id.* (citing *Nolasco v. Kijakazi*, No. 21-CV-4119, 2023 WL 2773532, at *13 (E.D. Pa. Apr. 3, 2023))).

The Commissioner responds that the ALJ's RFC determination was supported by substantial evidence in the form of: Plaintiff's own reports stating that her left-sided weakness had almost entirely resolved; clinical notes indicating Plaintiff's migraines had improved significantly after starting a regimen of topiramate; the findings of State agency medical consultants, who opined that Plaintiff was capable of a range of light work; and Plaintiff's largely normal mental and physical status examinations.  (Resp., ECF No. 11, at 2).  Moreover, the Commissioner notes that the ALJ accommodated her impairments by tailoring Plaintiff's RFC determination to her specific limitations.  For instance, the ALJ limited Plaintiff to certain postural maneuvers and noise levels, and to light work to accommodate her complaints of generalized weakness and fatigue.  (*Id.* at 2 (citing R. 26-30)).  Ultimately, the Commissioner maintains that this RFC sufficiently incorporated the limitations established by the record.  (*Id.* at 7).

Regarding Plaintiff's FMD, the Commissioner highlights that the ALJ noted it was well-controlled while treating with statin medication, and also that Plaintiff declined to undergo the recommended angiogram.  (*Id.* at 8-9 (citing R. 22, 26, 667, 930, 1143, 1152, 1212, 1214)).  As for her purported mental health issues, the Commissioner emphasizes that the ALJ found

Plaintiff did not have any severe mental impairments, given her consistently normal mental status examinations. (*Id.* at 9 (citing R. 20, 30-31, 1049, 1111, 1113, 1117)). Lastly, concerning her complaints about the severity of her physical limitations, the Commissioner underscores the ALJ's reliance upon: physical therapy notes indicating Plaintiff had improved in a very short time period and had "achieved nearly all functional goals"; Plaintiff's own reports that she could perform light household chores; record evidence indicating Plaintiff did not require an assistive walking device and was able to increase her walking endurance and activity tolerance; Plaintiff's reports that her left-sided weakness had resolved, and that her migraines had resolved as of September 2022 with the use of topiramate; Plaintiff's longitudinal treatment history; and the prior State agency opinions noting Plaintiff had generally normal examinations with minimal weakness, negative brain MRI, and anemia, which could be contributing to fatigue and dizziness but which did not preclude ability to perform a range of light work. (*Id.* at 10-11 (citing R. 25, 27, 80-86, 87-93, 667, 930, 962, 972, 977, 982, 987, 992, 997, 1002, 1008, 1037, 1039, 1045, 1049, 1050, 1152, 1212, 1216)).[3]

### 2.    Analysis

As noted above, the ALJ alone is responsible for fashioning a claimant's RFC. In doing so, she must consider all evidence before her. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999). That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. *See Fargnoli*, 247 F.3d at 41; 20 C.F.R. § 404.1545(a). The

---

[3] Plaintiff's Reply reaffirms the arguments contained in her Request for Review, adding only that the Commissioner failed to respond to several of her arguments presented on brief, which, in and of itself illustrates the meritoriousness of her positions. (Reply, ECF No. 13, at 3-5).

ALJ must offer a narrative-based analysis which must contain sufficient development of the record and explanation of findings to permit meaningful review. *Jones*, 364 F.3d at 505.

Based on the above principles, the ALJ did not err in fashioning Plaintiff's RFC. She surveyed the relevant medical opinions, Plaintiff's treatment notes, and her and her family's statements regarding her physical and mental limitations, and ultimately determined that although the record evidence illustrated that Plaintiff had certain medically determinable impairments, the totality of the evidence still supported the conclusion that she could perform a range of light work. (R. 19-31).

Plaintiff's symptoms associated with her stroke (which likely stemmed from FMD)[4] included: headaches and migraines, general fatigue, loss of reflex and balance issues, left-sided weakness, PTSD, anxiety, and social phobia. The ALJ noted these symptoms but ultimately concluded that they had largely resolved shortly after Plaintiff suffered the February 19, 2022, stroke. (*See generally* R. 19-31).

With regard to her physical symptoms, the ALJ noted that Plaintiff reported on February 26, 2022, mere days after suffering her stroke, that she was improving, not experiencing headaches, and felt that her strength was returning. (R. 25 (citing R. 343)). By October 2022, she related that her left-sided weakness improved with physical therapy and had largely resolved. (*Id.* (citing R. 666-67, 960-1044, 1049)). In addition, in June 2023 she confirmed that she no

---

[4] There is some discussion between the parties regarding Plaintiff's decision not to undergo an angiogram to confirm an FMD diagnosis, the ALJ's consideration of that decision, and the significance of her purported FMD generally. (*See* Pl.'s Br., ECF No. 8, at 4-6, 19-21; Resp., ECF No. 11, at 8-9). This discussion is a red herring, however, as it is evident from the ALJ's decision (and as acknowledged in both parties' briefs) that she proceeded under the understanding that Plaintiff *does* suffer from FMD, and that that condition caused Plaintiff's stroke and associated symptoms. (*See generally* R. 19-31; Pl.'s Br., ECF No. 8, at 10, 19-22; Resp., ECF No. 11, at 8-9). The ALJ's decision illustrates that in determining disability she did not construe Plaintiff's decision not to undergo angiogram testing against her. (*Id.*).

longer had left-sided weakness.  (*Id.* (citing R. 1212)).

Relatedly, the ALJ highlighted that Plaintiff's migraines had largely resolved by September 2022 after starting topiramate.  (R. 26 (citing R. 930)).  Though she still experienced headaches, they were not as severe as her former migraines, did not occur every day, and were shorter in duration.  (*Id.* (citing R. 666, 1045)).  The ALJ also noted Plaintiff's increased headaches in June 2023 but concluded that given their recency no evidence existed that they would continue at this frequency or intensity.  (*Id.*).  As for her complaints of fatigue and weakness, though the ALJ found that the record illustrated these symptoms may have been overstated, she still accommodated them by limiting Plaintiff to light work.  (*Id.*).  And again, Plaintiff herself conceded that she felt her strength returning shortly after suffering the stroke.  (R.343).  Further, though the ALJ did not specifically discuss Plaintiff's asserted balance or reflex issues, she determined that Plaintiff's gait was consistently normal.  (R. 26 (citing R. 510, 666, 723, 1055-56, 1136)).  In addition, she acknowledged that Plaintiff consistently reported her headaches were exacerbated by loud noises, and therefore restricted her to only moderate noise levels.  (R. 25-26 (citing R. 740-41, 793, 930, 1045, 1052, 1214-18)).  Finally, the ALJ relied upon the opinions of State agency consultants Drs. Myers and Deleo, who each opined that Plaintiff could perform a range of light work.  *Chandler*, 667 F.3d at 361 ("State agent opinions merit significant consideration [by the ALJ.]") (citing SSR 96–6p, 1996 WL 374180 (July 2, 1996) ("Because State agency medical and psychological consultants . . . are experts in the Social Security disability programs, . . . 20 C.F.R. §§ 404.1527(f) and 416.927(f) require [ALJs] . . . to consider their findings of fact about the nature and severity of an individual's impairment(s).") (alterations in original)).

Regarding her mental symptoms, the ALJ found that Plaintiff had the following

medically determinable impairments: anxiety disorder, agoraphobia, depressive disorder, and adjustment disorder. (R. 20). However, she also concluded that they do not cause more than minimal limitation in Plaintiff's ability to perform work-related activities. (*Id.*). She noted Plaintiff's occasional anxious mood but emphasized her consistently normal mental status examinations throughout the record. (R. 20-21, 29 (citing R. 1045-67, 1110-20)). Furthermore, she specifically highlighted the psychological evaluation of Wilson-Carr, N.P., who recorded anxious mood but otherwise normal mental status results and expressly determined that Plaintiff's symptoms associated with her anxiety and depression had decreased 30 percent over the prior month. (R. 20-21, 27, 29-30, 1111-18). Moreover, to the extent Plaintiff complained of difficulty concentrating, the ALJ explained that that was primarily due to headaches, not mental health limitations. (R. 21 (citing R. 37-78)).

The above substantial evidence supports the ALJ's determinations regarding Plaintiff's RFC, inasmuch as it indicates her symptoms had either resolved or were manageable through treatment. *See Burnett*, 220 F.3d at 118. Her physical symptoms had largely resolved a short time after suffering her stroke, her ongoing headaches were manageable with topiramate, and her social phobia and anxiety manifested in no more than minimal functional limitations. To the extent that Plaintiff argues the ALJ failed to consider certain evidence in fashioning Plaintiff's RFC, that contention amounts to a mere disagreement with the ALJ regarding how much weight to assign the varying pieces of evidence in the record. *See Perkins v. Barnhart*, 79 F. App'x 512, 514-15 (3d Cir. 2003) ("[The claimant's] argument here amounts to no more than a disagreement with the ALJ's decision, which is soundly supported by substantial evidence."); *Markoch*, 2020 WL 7586953, at *4-5 ("It is Plaintiff's burden to establish the severity of her impairments, and Plaintiff's challenge to the ALJ's consideration of her non-severe impairments amounts to mere

33

disagreement with his analysis rather than showing any substantive error."); *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("Surveying the medical evidence to craft an RFC is part of the ALJ's duties.").[5]

In sum, for the reasons discussed above, the ALJ did not err in her formulation of the RFC.

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**.  An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[5]  Plaintiff argues that the ALJ completely disregarded her purported PTSD diagnosis in conducting her RFC analysis.  (Pl.'s Br., ECF No. 8, at 3).  However, the ALJ's decision makes clear that she considered all the evidence related to Plaintiff's purported mental limitations and ultimately disagreed with Plaintiff's contention that her mental impairments precluded her from work.  In addition, Plaintiff provides no argument as to how her PTSD diagnosis actually manifested in ways that limited her functionality that were any different than those already considered by the ALJ.  To the extent Plaintiff highlights record evidence related to this particular issue, "[t]here is no requirement that the ALJ discuss in [her] opinion every tidbit of evidence included in the record" *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004), and it is incumbent upon Plaintiff to establish the severity of her impairments, *Markoch*, 2020 WL 7586953, at *4-5.  *Cf.* 20 C.F.R. §§ 404.1521 (providing that the ALJ will not use a claimant's statement of symptoms or mere diagnosis to establish disability).